# JANUARY TERM, 1855.

WIGHT *et al. vs.* MAXWELL *et al.*

A vessel while subject to a valid lien in favor of creditors residing in this State, for materials furnished towards her construction, was removed from Michigan to Ohio, and there contracted further debts for her completion. The Ohio creditors attached her in the latter State, and sold her upon their claims. The Ohio Boat and Vessel law, under which the proceedings there were had, provided for no notice of the proceedings to non-residents, and, in fact, all such creditors were by said law precluded from appearing and asserting their claims against the vessel; *held*, that the proceedings in Ohio were not in effect proceedings *in rem*, that they had no extra territorial force, and did not displace the previous lien of the creditors in this State.

Case reserved from the Wayne Circuit.

The steamer Globe was built near Detroit, in this State; and in the course of her construction, contracted a large debt to the plaintiffs for materials. For this debt, the laws of Michigan gave the creditors a lien. The Globe was subsequently taken to Ohio, where she contracted further debts for her machinery, and fitting for service. For these Ohio debts, she was seized at Cleveland, under the boat and vessel law of that State, and sold on execution to E. T. Sterling. The Ohio law, in force at the time the vessel was seized, provided for no notice of the proceedings to non-resident creditors, and allowed domestic creditors only to resort to this process against vessels; all other creditors being precluded from prosecuting their claims under the proceedings. Sterling afterwards sold the vessel to the defendants in this cause.

The Globe then came to Detroit, where she was seized

under the boat and vessel law of this State (*R. S.*, 537) by the plaintiffs, to enforce their lien. The defendants set up the judicial sale in Ohio in bar, and claimed that the plaintiffs' lien had become divested thereby.

*Backus & Harbaugh*, for plaintiffs.

The claim of the plaintiffs being a lien by statute (*R. S.*, 537, *and Mass. R.*, 255), was also a maritime lien (*U. S. Cond. R.*, 596). The claim of plaintiffs could not be divested, except by proceedings under the law creating it, or the neglect of plaintiffs to protect it under judicial proceedings on the part of other claimants, to which they could be parties. Faith and credit cannot be given to the Ohio proceedings as the judgment of a sister State, because they affected the rights of citizens of the State who were not, and could not be parties to them. (*Story's Conf. L.*, 37, 271; 13 *Pet.* 588, 589.) Parties having neither actual or implied notice of proceedings are not bound thereby. (3 *U. S. Cond. R.*, 340; 3 *Sumn.* 600; 1 *Greenl. Ev.*, 562, 563, 578; *Story Confl. Laws*, § 546, 547, 592.) *A fortiori*, the same principles apply here where the parties had no notice, and could by no possibility appear and defend, if they had. The claim of the Ohio creditors created no lien in their behalf until actual seizure of the vessel (14 *Ohio R.*, 410); but the plaintiffs' claim became a lien when it was contracted, by the laws of this State. (*Mass. R.*, 469.) At the date of the levy in Ohio, the boat was subject to the specific lien of the plaintiffs, and the levy was also subject to such lien. (4 *Pick.*, 466; 3 *Pet.*, 305; 6 *Mass.*, 244; 1 *Pick.*, 399; 2 *N. H.*, 15; 5 *J. R.*, 345; 8 *East.*, 467; 5 *Conn.*, 545; 11 *Pick.*, 525; 19 *Ohio R.*, 21.) If the Ohio proceedings would tend to defeat the plaintiffs' previous lien, they and the statutes on which they were based, would to that extent be void, under the Constitution of the United States, as *impairing the obligation of contracts*. (1 *How.*, 311.) The rule applies to a judgment as well as statute. (7 *How.*,

766.)   The Ohio law and judgment under it, are bad upon the authority of *Wilkinson & Leland*, 2 *Pet.*, 657; 5 *Barb. S. C.*, 484.

*Lothrop & Duffield*, on the same side.

The lien given by our statute has all the qualities of a maritime lien, and though the materials were furnished by the plaintiffs in a home port, the law makes the case one of Admiralty jurisdiction.

Maritime liens do not originate in, or depend upon possession, but they attach in legal contemplation to the vessel wherever she may go, for a longer or shorter period, in whosesoever hands she may be, and may be enforced wherever the *lex fori* will admit. (*Benedict Adm.*, § 271; 1 *Sum.*, 81; 9 *Mis.*, 59; 2 *Story R.*, 455; 21 *Verm.*, 599; 3 *Hagg.*, 136; *Ware*, 108.)

The lien of the material man has been put on a like footing with that of a seaman for his wages, and when created by local statute, sanctioned by the highest authority. (2 *Gall.*, 350; *Gilpin*, 1; 1 *Story R.*, 72; 2 *Ib.*, 456.) These liens are not lost by dispossession, an intervening voyage, or lapse of time short of the statute of limitations. (3 *Kent Com.*, 196; 2 *Story R.*, 456; 5 *Serg. & R.*, 49; 5 *Rowle*, 246; *Ware*, 186; 3 *Hagg.*, 238.) This lien adheres to the vessel in the hands of a *bona fide* purchaser (15 *Ohio R.*, 583; 16 *Ib.*, 278; 18 *Ib.*, 187; 9 *Mis.*, 63; 1 *Paine*, 180; *Ware*, 88; 1 *Sum.*, 551; 5 *Pet.*, 710), even though the sale be judicial under execution (*Gilpin*, 1), or where the vessel is forfeited by Government. (5 *Pet. Cond. R.*, 636.)

The Ohio statute and proceedings, seeking, as they do, to postpone all other rights to those of their own citizens, are entitled to no respect in the Courts of other States, on the principle of *comity*. (2 *Kent Com.*, 461; *Story Confl. L.*, 20, 21, 33, 37, *and notes*; *Ib.*, 203, 204, 271, 289, 290; 17 *Martin's La. R.*, 569; 13 *Pet.*, 589; 7 *Gills*, 391; 12 *Mis.*, 569;

5 *Geo.*, 505, 506; 6 *M. & S.*, 92; 3 *Mass.*, 517; 49 *C. R.*, 460; *S. C.*, 20; *J. R.*, 258; *Story Confl. L.*, 345, *and note;* 3 *Pet. Cond. R.*, 306; 3 *Sum.*, 600.)

The Ohio proceedings do not come within the purview of the Constitution of the United States and acts of Congress relating to judgments of sister States. . The act is limited to judgments where the persons sought to be bound were actual parties by appearance or service of process, when within the jurisdiction of the Court. (2 *Am. Lea Ca.*, 720, *et seq.;* 9 *Mass.*, 462; 15 *J. R.*, 141; 5 *Wend.*, 148; 6 *Pick.*, 232; *Ib.*, 354; 7 *Gill R.*, 420; 7 *Gill & J.*, 442; 1 *Rh. Isl.*, 73; 1 *Cush.*, 24; 13 *Pet.*, 312; 11 *How.*, 165.)

The Ohio proceedings were not *in rem.* The whole world are bound by proceedings and judgments *in rem,* for the reason that all the world are, or may be, parties thereto (2 *Smith's Lea. Ca.*, 536); but to constitute a proceeding *in rem,* every person who has any interest or claim in the property must have the right to intervene for his own interest. Any proceedings not having this incident are not *in rem.* (*Benedict Adm.* §§ 364, 365, 434; 3 *Hagg.*, 132; 9 *Cranch.*, 144; *Ware,* 105; 2 *Adm. Decis.*, 452; 3 *Sum.* 600; 12 *Mis.*, 569; 7 *Term R.*, 533; 8 *Ib.*, 192; 7 *Bing.*, 495; 1 *Camp.*, 419; 12 *Mass.*, 291.)

The sole effect of the Ohio judgment out of that State was to transfer the property of the general owner of the vessel, without affecting the rights of the plaintiff. The process was in form *in rem;* the judgment in effect *in personam.* (2 *Sum.*, 587; *Wallace, jr.*, 311.)

*VanDyke & Emmons* and *Wilcox & Gray*, for defendants.

1. The Statute of Ohio, under which defendants claim, intended to give by virtue of a judgment and sale, an absolute and indefeasible title to the purchaser, which would divest all counter claims, liens and titles. By it, the *vessel* and not the *owner*, consignee, or steward, is declared liable. The ship

is impleaded by name. It is liable, moreover, for debts other than those for which the owner would be liable, showing conclusively that the *vessel* is treated as an original source of responsibility, irrespective of *ownership.* If she goes within the State, *owners,* lien holders, and all having interests in her, are warned by the law. Credit is given to *her.* The Ohio decisions establish this construction of this statute. (18 *Ohio R.*, 187; 17 *Ib.*, 359; *Ib.*, 460; 14 *Ib.*, 408.)

2. The power of the States to enact such laws is recognized by the legislation of Congress, and numerous decisions of the Federal Courts. (6 *How.*, 344; 1 *Paine,* 620; 1 *Story,* 72; 4 *Wheat,* 438; 9 *Ib.*, 409; 7 *Pet.*, 324; 11 *Ib.*, 175; 2 *Gall.*, 345.)

The rights of parties under State laws, similar to the Ohio statute, have been administered in the Federal Courts under the summary *ex parte* forms of the Admiralty, in numerous cases, in none of which the lien existed irrespective of the local law. (1 *Paine,* 620; *Gilp.*, 473, 479, 480; 1 *Cranch,* 299.) The following are some of the cases showing the enforcement and construction of the local statutory remedies: 1 *Wend.*, 39; *Ib.*, 557; 5 *Ib.*, 510; *Ib.*, 564; 17 *J. R.*, 54; 2 *Wend.*, 303; 3 *Caines Ca.*, 38; 20 *J. R.*, 194; 1 *Wend.*, 35. Michigan has for many years administered such a law. (*Man.*, 171; *Ib.*, 507; *Ib.*, 469.) In Arkansas a similar law has been enforced, where no notice is required. (5 *Eng.*, 411; 6 *Ib.*, 237.) Also, in Alabama. (6 *Ala.*, 50.) So in Kentucky. (8 *B. Mun.*, 135.) Also, in Louisiana. (1 *La. R.*, 136.) From the earliest period of her Colonial Government, Pennsylvania has enforced such a law. (*Gilp. R.*, 473.) A similar law has been in force in Missouri. (6 *Mis. R.*, 552.) Also, in Indiana. (6 *Blackf.*, 148; 5 *Ib.*, 483; *Ib.*, 188.)

3. The mode of proceeding in Admiralty is more summary, and in a far greater degree *ex parte* and without notice, than under the Ohio law; and, if upon general principles, titles are valid under decrees of the former, or a greater

7

reason will they be upheld under the latter. As to Admiralty proceedings, see Rule 9 of the Admiralty. (_Conklin's Adm._, 493, 518, 521, 530.) The former modes of practice, and the general principles of Admiralty practice, required no public notice whatever, but service upon the thing itself was sufficient. (_See Ware R._, 105; _Brown's Civil and Adm. Laws_, 396.)

4. The proceeding under which the defendant claims, is _in rem_. His title is absolute against all persons having an interest to assert, at the date of the decree. Neither actual notice, publication, monition or proclamation is necessary to vest the power of judgment in the tribunal condemning the property. (_See Phil. on Ins._, 686 _to_ 693; 4 _Cranch_, 241; _Ib._, 293; 6 _Ib._, 281; 7 _Ib._, 423; 4 _Pet._, 475; 2 _Brock_, 126; 8 _Martin La. R._, 464; 2 _Cow. & Hill Notes_, 881, 882, 884, _and cases cited; Bees. Adm. R._, 164; 2 _Smith Lead Ca._, 497, 498, _and cases cited on pages_ 503, 504, 505, 506.) That foreign judgments, _in rem_, are _conclusive_ as to the title they affect to determine, see 1 _Grenl. Ev._, § 541. That the rule is applicable to other Courts acting _in rem_, as to Admiralty Courts, see _Ib._, § 547. As to the notice, which it is claimed should be given to parties _in rem_, see 3 _Sum. R._, 605; 9 _Cranch_, 126, showing that it is only such notice as " inhered in the seizure of the thing itself." And see 3 _B. & P._, 544, where Lord Elden shows that the conclusiveness of decrees, in such cases, _is not_ because those against whom they operate _can appear and defend._ (_See_ 5 _Rob. Adm. R._, 5, 221; 4 _Ib._, 6, 24, 26; 6 _Ib._, 126; 8 _Cranch_, 418.)

5. Judgments _in rem_ are conclusive, not because _all interested_ are deemed parties, or because they can become such, if personally present. In many cases claims are barred, the owners of which, under the Admiralty law, cannot be admitted as counter claimants, to oppose the libellant's claim. The following cases show that judgments _in rem_ pass the title of property, irrespective of the question of who are or

who can be parties. (1 *Sum.*, 329; 3 *Mason*, 255; 1 *Pet.*, 547; 1 *B. & P.*. 544, 545; 6 *Rob. Adm. R.*, 24; 5 *Ib.*, 221; 2 *Hagg.*, 84; *Ib.*, 88.)

6. Publication, proclamation, unserved monitions, and the posting of notices, within a State or county, have no office whatsoever to extend beyond their own territory the juris-diction of their tribunals, and the want of such an incident, therefore, can in no way affect proceedings *in rem.* (*Story Confl. L.*, §§ 54, 56, 547, *and note 1*, 549, *and note 1 and 2*; 4 *Metc.*, 438; 1 *Cush.*, 23; 2 *Cow. and H. Notes*, 907 *to* 915; 9 *East.*, 192.) But we maintain the power of a State to provide for a proceeding without such notice ; that such notice can neither add to nor diminish the extent of our juris-dictions. The State and Federal decisions in relation to insolvent discharges, illustrate the limit of this municipal authority. (*See* 2 *Kent Com.*, 474 *to* 480; 4 *Wheat.*, 11; 12 *Ib.*, 213; *Ib.*, 369; 6 *Pet.*, 349 *to* 365; 26 *Wend.*, 54, *in which the English cases are fully cited.*)

By the Court, WHIPPLE, J.

It was conceded by the counsel, in the extended and luminous arguments with which the Court was favored, that the leading question reserved for our advice was of the highest importance. In this opinion the Court fully concur. The constantly increasing commerce of the Lakes admon-ishes us that our decisions, in respect to interests so vital, should be formed with great deliberation. In this spirit the case before us has been considered, and if the judgment we are about to pronounce shall, in its consequences, tend rather to cripple than foster commercial enterprise, so intimately connected with the prosperity of the States more immedi-ately concerned, it will be a source of deep regret. The remedy for any evils that may exist, must be applied by the Legislative authority of those States, rather than by the judicial tribunals, whose duty it is to interpret and

administer the law as it is promulgated by the law-making power.

That the plaintiffs acquired a lien on the steamboat Globe, by virtue of the provisions of the statute of this State, is not denied ; but it is contended by the defendants, that this lien was divested by virtue of the judicial proceedings and sale in Ohio, under the provisions of the act of that State in relation to Boats and Vessels.

The proposition that the sale thus made gave to the purchaser an absolute and indefeasible title to the boat, divested of all counter claims or pre-existing liens, is sought to be maintained on the principle that the proceedings and judgment in Ohio were *in rem*, and to such a proceeding and judgment attaches all the legal consequences of a decree *in rem* in Admiralty, where the Court has actual possession of the thing condemned. If this position can be successfully defended, then it is quite clear that the defendants are, upon the facts disclosed in this case, entitled to judgment.

In order to a correct understanding of the merits of this controversy, it becomes important to determine with accuracy the nature and extent of the rights intended to be secured both by the Michigan and Ohio statutes, to the persons seeking the benefit of their provisions. In respect, then, to the Michigan statute, it has been determined by the Court that Wight acquired a lien on the Globe when the materials employed in her construction were furnished by him to Robinson, the owner ; which lien might be enforced in the mode prescribed by that statute. The Ohio statute has received a practical construction by the Supreme Court of that State, which declared that, under like circumstances, no lien attached until the actual seizure of the boat or vessel by virtue of process issuing out of a Court of competent jurisdiction. (*Jones & Watkins* vs. *Steamboat Commerce*, 14 *Ohio Rep.*, 408.)

The law of this State, it has also been judicially determined,

excluded foreign claimants from its benefits, and confines the rights intended to be secured, and the remedies for the enforcement of those rights, to domestic creditors. The same construction, it is admitted, has been given to the Ohio law.

Under our statute, all persons having liens upon the boat or vessel against which proceedings may have been instituted, are allowed to become parties, and share in the distribution of the moneys arising from the sale of such boat or vessel. In Ohio it has been held that "the lien first attaching by virtue of the seizure, will be first satisfied, and so on, in the order of priority." (14 *Ohio Rep.*, 408.) No provision is made by which other creditors may intervene under a seizure thus made, and enforce their claims, but such creditors can only avail themselves of the remedy which the statute provides, by instituting new proceedings, and acquire successive liens by actual service of process. In the language of the Supreme Court, in the cases cited, "a craft navigating the waters of this State cannot be held under this statute, without disturbing its regular trips from place to place, and the delay will enable the vigilant creditors, seeking to prosecute their claims, to attach it successively at any time after the first seizure and before sale ; and, in that way, make out of her the amount for which a sale can be effected. The first judicial sale, then, must pass the entire interest, and vest in the purchaser a perfect title. Indeed, the provisions of the sixth section seem to show that the object was to treat the property after execution upon it, the same as if it had been levied upon by any other execution against the owner." This conclusion seems to follow from the opinion expressed by the Court, in determining the question as to whether a lien was created by the first section of the statute. Upon this point the Court say, "The craft *shall be liable.*" These words have sometimes been spoken of as creating a lien for the demand. If they have such effect, *the claim first in order must have*

*the priority;*" and again, " Now if the intention had been to create a lien, that is, *bind the boat*, instead of creating a liability to *mesne process*, and to be substituted as defendant, in place of the owners, the fair presumption is, that the words and phrases commonly used to convey that intention, and not those commonly used to convey a different meaning, would have been employed. We therefore declare that the first section of the act does not create a lien; it merely declares a liability, etc."

The sixth section of the Ohio statute, referred to in the opinion of the Court, is as follows : " That upon the return of the writ, the pleadings and other proceedings shall be, as in other cases of process, served and returned, and, after judgment, the property seized and still held, may be sold on execution to satisfy the judgment, and the surplus money, if any, arising from such sale, shall be returned to the owner, master or agent, on demand, as in other cases of execution," etc. This case, from which I have freely quoted, establishes the following propositions : First, a judicial sale of a boat or vessel under the Ohio law, vests in the purchaser a title, divested of all liability to be again proceeded against, for a claim existing at the time of the sale ; Second, the first section of the Ohio law gives no lien, but makes the boat or vessel liable to *mesne process*, and to be substituted as defendant, in place of the owners ; Third, the fourth section of the Ohio law gives a lien, by providing for the seizure of the boat or vessel ; Fourth, if the first section of the act had given a lien, then by the decision in Ohio, it is clear that the first claim or demand out of which the lien springs would have priority, as no lien whatever is created until actual seizure. That first acquired is to be first satisfied, without regard to the time when the debt sought to be enforced was contracted.

The lien the plaintiffs seek to enfore attached to the boat not by virtue of the general maritime law, for the Globe, as

appears by the facts of this case, was built near this city, and the materials were supplied in a home port ; but, by the local law of this State, which gives a lien for materials furnished "in or about the building, repairing, fitting, furnishing or equippping any ship, boat, or vessel." The lien thus created by the local law, partakes of the nature of a maritime lien, the contract being maritime, and the lien attaching to it, may be enforced by a proceeding *in rem* in the Admiralty. The local law furnishes the guide by which the rights of the parties are ascertained, and the Admiralty administers the appropriate remedies. Or the lien may be enforced in the State tribunals, in the mode prescribed by statute.

It may aid in conducting us to a correct conclusion, to define with exactness the nature of the lien given by the maritime law to the material man, and some of its incidents. This lien is differently defined by different authors, but its true nature is expressed with sufficient clearness in the various definitions that have fallen under my observation, especially if construed with reference to that code from which our notions of its legal qualities are borrowed. By some it is said to be "a tie hold or security ;" by others, "a sort of proprietary interest springing from the nature of the transaction, and the beneficial service rendered to the ship, the great agent of maritime commerce." Other authors define it to be a "hold upon property specifically attaching thereto, for the satifaction of some claim." These definitions are equally applicable to all maritime laws. The lien of the material man has its foundation in the necessities of maritime commerce, and is, therefore, regarded with great favor by commercial nations. The contracts in virtue of which such a lien attaches are usually made by the master of the ship, and when so made in good faith not only bind the ship, but the master and owner of the ship are personally answerable. The lien thus obtained attaches by operation of the law

without any *express* contract to that effect, and is enforced by an action *in rem* directly against the ship. This lien is implied according to the maritime law of Continental Europe, as well in respect to domestic as foreign ships, and whether the supplies are furnished in a home port or abroad. By the maritime law of England, however, no lien is given for supplies furnished in a home port, without an express hypothecation. This principle, the result of the decisions of the English Courts, has been considered illiberal and inequitable, and a remedy is provided by the act of 384 Victoria, ch. 65, sec. 6, by which remuneration for supplies furnished to any foreign or sea-going vessel may be enforced in Admiralty, whether such vessel was within the body of a county or upon the high seas when such supplies were furnished. The principles established by the English Courts having been recognized in this country, the necessity was felt for providing a suitable remedy for supplies furnished in a home port; hence the legislation in this and other States by which a lien is given in such cases, which may be enforced by Admiralty process, or in the State tribunals in the manner pointed out by the local law.

A lien attaching by the general maritime laws for supplies, follows the vessel whithersoever she may go, and though acquired in one State or country, for supplies furnished our own ships while abroad, are always enforced in our Admiralty Courts, as Mr. Justice Story affirms, upon principles of equity, which pervade the Maritime Courts of all countries.

A lien at the common law implies that the party by whom it is claimed, is either in the actual or constructive possession of the thing; and his right to detain the thing continues until his claim is satisfied. But no such qualification of the doctrine of liens is applicable to maritime liens, which exist independently of possession. Hence, the doctrine that the lien once acquired by virtue of the maritime law, clings to the ship wherever she may be borne, and is thus distinguished

from the common law lien, which presupposes possession of the thing, and which is gone when the possession is relinquished. In respect to personal property, privileges, hypothecations and liens allowed in the country where the contract is made, which gives rise to them, are recognized and deemed to be binding in any other country where the property may be found, even against purchasers having no knowledge of their existence, and against creditors who, by the law of *rei sitæ,* have a preference of right; and this rule has its foundation in those general principles as to the operation of contracts, recognized as well by the civil as the common law; and indeed, it may be asserted with confidence that as movables have no locality, a lien, privilege, or hypothecation, once rightfully attaching *in rem,* will not be displaced by the mere change of locality of the property. (*Story's Conflict of Laws,* § 402.) This rule has been administered in the English Courts, to the extent of applying a foreign law to the right of stopping *in transitu,* although such foreign law was materially different from the law of England. (*Inglis* vs. *Underwood,* 1 *East. R.,* 515.) That there has been some conflict of opinion among jurists, both at home and abroad, in respect to the extent to which liens arising under a foreign law should be allowed against subsequent purchasers, or against creditors in the country where the property may be found, is not denied; and it may be conceded that an exception to the general doctrine exists in relation to maritime liens founded upon public policy, and the necessities of commerce. Maritime hypothecations would be regarded as a slender security, if rights acquired by the general maritime law in conseqeunce of advances made, might be undermined by a local law unknown to the lender. In Harmer *vs.* Bell (22 *Eng. Law and Eq.*), the subject of maritime liens was argued with great ability by eminent counsel, and fully considered by the judicial committee and Lords of the Privy Council, upon appeal from the Admiralty

Court. Sir John Jervis, in delivering the judgment of the Court, adopts the definition of a maritime lien given by Lord Tenterden, who declares it to mean "a claim or privilege upon a thing to be carried into effect by legal process;" and "this claim or privilege (says the learned Judge), travels with the thing into whatsoever possession it may come. It is inchoate from the moment the claim or privilege attaches, and when carried into effect by legal process, by a proceeding *in rem*, relates back to the period when it first attached. Applying this principle to the case before the Court, it was held that the "Bold Buccleugh" (the steamer arrested under process of the Court of Admiralty), was liable for damages, arising from a collision, though in the hands of a purchaser without notice of the damage, or the proceedings instituted against her. In commenting upon the rule thus illustrated and enforced, the Court remark: "It is not necessary to say that the lien is indelible, and may not be lost by negligence or delay when the rights of third parties may be compromised; but where reasonable diligence is used, and the proceedings are had in good faith, the lien may be enforced, into whosesoever possession the thing may come." It is proper to remark, that the judgment of the Privy Council was in affirmance of that delivered by Dr. Lushington, in the Admiralty Court.

Having briefly considered the doctrine of maritime liens, the next step in the process of our inquiries will be to ascertain the nature and incidents of a proceeding *in rem*, by which these liens are carried into effect. The vague and apparently conflicting opinions entertained upon this subject by learned Judges, seem to render its discussion necessary. A survey of the numerous authorities cited by counsel, has left upon my mind a deep impression that in those States where proceedings of this nature are seldom resorted to, great misapprehension exists in respect to its true character. The nature of this proceeding is stated with characteristic fullness

and clearness by Ch. J. Marshall, in Mankin *vs.* Chandler and others. (2 *Brock.*, 125.) After controverting the proposition that every action in which a specific article is demanded, is not necessarily a proceeding *in rem*, the learned Judge then lays down the rule by which cases of that description are to be ascertained, in the following language: "I have always understood that where process is to be served on the thing itself, and where the mere possession of the thing itself, by the service of the process and making proclamation, authorizes the Court to decide upon it without notice to any individual whatever, it is a proceeding *in rem*, to which all the world are parties. The rule is one of convenience and necessity. In cases to which it applies, it would often be impossible to ascertain the person whose property is proceeded against, and it is presumable that the person whose property is seized, is either himself attentive to it, or has placed it in the care of some person who has the power, and whose duty it is to represent him and assert his claim. Such claim may be asserted, but the jurisdiction of the Court does not depend on its assertion. The claimant is a party, whether he asserts his claim or abandons it."

A careful analysis of this definition will answer the purpose I have in view, in treating of this branch of the case before the Court. To constitute a proceeding *in rem*, then, in the sense in which that term is used in the maritime law, several things must concur: 1. The process is served on the thing itself. 2. The service of process and making proclamation, authorizes the Court to decide upon it without notice to any individual whatever. 3. Such service of process, and the possession of the thing itself by such service, and making proclamation, authorizes the Court to decide upon it without further notice to any individual. 4. In such a proceeding all the world are parties. These are the essential elements of an action *in rem*, which is distinguished from other actions where a specific article is demanded by a well-defined line.

Thus to adopt the illustrations given by Ch. J. Marshall, in the case referred to, a writ of right which demands lands, or of detinue which demands a personal chattel, is not a proceeding *in rem*, to which all the world would be parties, and by which the rights of all the world would be bound. The distinctions between actions of this nature and those strictly *in rem*, are too obvious to require further notice. The service of process on the thing itself operates as notice to all the world, and supersedes the necessity of notice to the owner in person. This rule is one of necessity, for, from the very nature of a proceeding *in rem*, and the circumstances under which such a proceeding is appropriate, it is obviously impossible to ascertain the persons whose property is proceeded against, or to procure a personal service of process.

The Admiralty law presumes that the person whose property is seized will not be inattentive to his interest, and such person, or his agent, duly constituted, may appear and assert his claim. This right on the part of the claimant to appear, and defend his rights, is a necessary incident to a proceeding *in rem.* It lies at the foundation of that principle which declares judgment *in rem* to be conclusive on all the world. I do not wish to be understood that this *assertion* of a claim is necessary to give jurisdiction to the Court, or validity to a judgment *in rem;* for in the expressive language of Ch. J. Marshall: "The claimant is a party whether he speaks or is silent, whether he asserts his claim or abandons it." By the act of seizure and making proclamation, all the world are parties; if all the world are parties, it follows that he who has a proprietary interest in the thing seized, may assert his rights in the manner and to the extent allowed by the principles and practice of the Courts within whose jurisdiction the thing is brought. It would strike the mind as somewhat anomalous that a claimant to property, who, by the act of seizure, is made a party to a proceeding by which a judgment of forfeiture or condemnation of that property is sought,

should be told by a tribunal where justice is administered, to be silent when his right to speak would seem unquestioned; to be told, that although a party to a suit, and interested in the judgment to be rendered, such a relation to the case and to the subject matter in controversy, does not entitle him to be heard in vindication of his rights; that he must be a silent spectator in a transaction in which his whole fortune may be involved. No argument is required to rescue the administration of justice from the charge of binding a party by a judgment, without first affording him an opportunity to be heard. A judgment thus rendered, is declared by the code of every civilized nation to be inoperative, and of no binding efficacy. The right to appear after due service of notice and to become a party to a suit, would answer no valuable purpose, unless the right to be heard was also secured. The object of notice in a judicial proceeding is to admonish a party that his interests are involved, and thus furnish him an opportunity of being heard in defence of those interests. To bring a person within the jurisdiction of a Court, and make him a party to a proceeding, and when he appears, and obtains a standing in Court, to tell him that all this is a mere empty formality, and close the door of justice upon him, would be little less than mockery. And this right to notice, which necessarily implies a right to appear and be heard, is of universal application, and is recognized in all Courts, whether proceedings be *in rem* or *in personam*. In the former, the character of the notice is in general less direct than in the latter; this results from the necessity of the case and the convenience of commerce, but still the general rule is maintained in full vigor. The cases which illustrate and enforce this fundamental principle, will be referred to when I come to consider the conclusiveness and effect of the Ohio judgment.

In treating of the conclusive character of foreign judgments, Mr. Justice Story says: "The same principle is applied

to all other cases of proceedings *in rem,* against movable property within the jurisdiction of the Court pronouncing judgment. Whatever the Court settles as to .the right or title, or whatever disposition of the property by sale, revendication, or transfer, or other act, will be held valid in every other country, where the same question comes directly or indirectly in judgment before any foreign tribunal." The learned commentator in this connection, and after stating some of the limitations to this general doctrine, uses the following pregnant language: "So it must appear, that there have been regular proceedings to found the judgment or decree; and that the parties in interest *in rem* have had notice, or an opportunity to appear and defend their interests, either personally or by their proper representatives, before it was pronounced; for the common justice of all nations requires that no condemnation should be pronounced before the party has an opportunity to be heard." In applying the principle thus stated in the case of Bradstreet *et al. vs.* Neptune Ins. Co. (3 *Sumner R.,* 600), Justice Story declares that where the sentence of a foreign Court *in rem* is sought to be held conclusive, there should· be some personal or public notice of the proceedings, so that the parties in interest, or their representatives or agents, may know what is the offence with which they are charged, and may have an opportunity to defend themselves, and to disprove the charges. This is a rule founded in the first principles of natural justice, that a party shall have an opportunity to be heard in his defence, before his property is condemned. The seizure and condemnation of property without affording an opportunity to parties in interest to appear and defend, is characterized as an " arbitrary forensic edict," rather than a "judicial sentence." The same learned Judge adds, that "if a civilized nation seeks to have the sentences of its own Courts held of any validity elsewhere, they ought to have a just regard to the usages of other civilized nations, and the principles of

public and national law, in the administration of justice. If they proceeded without any further charges of the offence, without any monition *in rem*, or notice to the parties, or those who represent them, without any hearing upon the facts, and without giving the party an opportunity to contest the charges, or to know what in particular those charges are; it is but just, and conformable to the rights of other independent nations, to disregard such sentences as mere mockeries, and as in no just sense regard them as being judicial proceedings. Such sentences ought to be deemed both *ex directo in rem* and collaterally, to be arbitrary edicts, or judicial frauds."

These principles are fully asserted and vindicated by Ch. J. Marshall, in the case of the Mary (9 *Cranch.*, 126, 142, 144), where it is expressly held that the reason why the whole world are bound by a decree of an Admiralty Court *in rem*, rests on the rule that every person having an interest in the *res* may make himself a party, and appeal from the decree.

The Court further add, that " *Notice of the controversy is necessary in order to become a party*, and it is a principle of natural justice, of universal obligation, that before the rights of an individual be bound by a judicial sentence, he shall have notice, express or implied, of the proceedings against him." It is obvious, then, that the extent of the principle that the whole world are bound by a decree *in rem*, is limited by the reason upon which its is founded. The doctrine of these cases is confirmed by a series of adjudications, both in England and in the Federal and State tribunals of this country, so harmonious in their results and so convincing in their reasoning, as to place it beyond the reach of doubt. Indeed, it may be safely assumed, that the principles they assert are too deeply rooted in the jurisprudence of every civilized nation to be now shaken. The only exception to be found to the universal application, is in the case of a seizure *juri belli*, which, it is held, supersedes the former

title of property. An exception which finds its justification in a code by which the private rights, however sacred, are often made to yield to the stern principles it inculcates and enforces. The doctrines I have attempted to establish, dispose of the case before us. They prove that neither the proceedings or judgment under the Ohio statute are, strictly speaking, *in rem,* but partake of some of the ingredients of both, an action *in personam* and *in rem.*

The rights of property acquired by the plaintiffs under our law, are of a character so sacred as to be protected by the Constitution. These rights once acquired cannot be impaired by the action of the Legislature of the States. The remedies for their enforcement are so interwoven with the right, as also to be beyond the reach of Legislative control ; and yet a power more transcendent than that possessed by the Legislature, is claimed for the proceedings in the Ohio Courts. It is contended that by virtue of those proceedings, the rights of the plaintiffs were superseded. It cannot be urged that the lien was waived, by allowing the boat to pass from our jurisdiction into that of another State. That lien continued beyond all controversy, until the act of seizure and sale in Ohio. That such a sale worked no forfeiture of the rights of the plaintiffs, I have endeavored to show. To give the judgment and sale in Ohio the extra territorial effect claimed for it, would, in my judgment, be investing the Legislature and Courts of that State with the power to confiscate property found within its limits, without regard to those fundamental principles of justice recognized by all civilized nations. Those principles are of universal obligation, and, if disregarded by one State or nation, such State or nation cannot claim anything on the score of comity from any other State or nation.

The State of Ohio was bound on every principle of comity not only to recognize the lien of the plaintiffs, but to afford all the remedies provided by its laws for its enforce-

ment. Upon appealing to the tribunals of justice of that State for the protection of their rights, they were repulsed, because, as it is said, the law they were administering was intended for the security and protection of its own citizens, and was not intended, and could not, therefore, be extended to citizens of another State where the contract, out of which their lien springs, was made. How, then, upon the principles of common honesty, and common justice, can it be said that the plaintiffs' lien was displaced. That it was not, is abundantly sustained upon the principles maintained in the adjudged cases to which I have referred.

To contend that such a judgment and sale binds these plaintiffs, is but the assertion of a right on the part of Ohio, through its judicial tribunals, to take the property of a citizen residing in this State, but happening at the time to be within its jurisdiction, and without notice to such citizen or an opportunity of defence, to decree its sale, and distribute the fruits of such sale among its own citizens. And now this Court is asked to sanction what appears to them an act of injustice. We are called upon to declare that a right, highly favored by the maritime law, a *privileged* claim, as it is styled by some authors, and in the significant language of a great Admiralty Judge, "an interest directly and visibly residing in the substance of the thing itself," was, by force of a sale made under the circumstances stated, consigned to a common grave. This we cannot do; and, in conclusion, to adopt the language of Mr. Justice Story, in the case of Bradstreet *et al. vs.* Neptune Insurance Company: I hold (said the learned Judge), that if it does not appear upon the face of the record in the proceedings *in rem*, that some specific offence is charged, for which the forfeiture *in rem* is sought, and that due notice of the proceedings has been given, either personally or by some public proclamation, or by some notification or monition, acting *in rem*, or attaching to the thing, *so that the parties in interest may appear and*

9

*make defence,* and, in point of fact, the sentence of condemnation was passed upon *ex parte* statements, without their appearance, it is not a judicial sentence, conclusive upon the rights of foreigners, or to be treated in the tribunals of foreign nations, as importing verity in its statements or proofs. The pertinency of these remarks to the case before us, is too obvious to need comment.

I will not attribute to the Legislature of Ohio any design to give to a sale, made under the provisions of their Boat and Vessel law, the force and effect claimed for it by the defendants. That law was manifestly intended to secure to their own citizens a more effectual remedy for the collection of claims against boats and vessels navigating the waters of that State, but never was intended to impair the rights of citizens of other States.

The cases referred to by counsel in argument, have all been carefully examined and fully considered, and it was my purpose to have noticed those upon which reliance was principally had, in the course of this opinion, but circumstances unecessary to refer to, but known to counsel, have made this task too burdensome to be borne. It was particularly my wish to review the opinions of the Dirtrict Judge of the United States for Northern New York, and that of the Circuit Judge, who entertained different and opposite views of the question before us ; but this I am unable to do.

It must be certified to the Circuit Court of the County of Wayne, as the opinion of this Court, that the claim of the plaintiff Wight, filed under the original attachment on which the steamboat Globe was seized, constituted an existing lien on said boat at the time of issuing said attachment, and that the same was not divested by the judicial proceedings and sale had in Ohio, and set up by the defendants, and that in respect to the second question propounded for our advice, no opinion is deemed necessary.