## BIDWELL ET AL *v.* WHITAKER ET AL.

Ch. 122, R. S., of proceedings for the collection of demands against ships, boats and vessels, applies to contracts made and injuries received within the state only, and not to such as have arisen without the state, and gives a specific lien on the boat or vessel for all such demands mentioned in the first section of the chapter.

It is only where a statute is ambiguous in its terms, that courts exercise the power of so controlling its language as to give effect to what they may suppose to have been the intention of the law maker.

CASE reserved from Wayne County Court.

*Van Dyke and Emmons,* for plaintiffs.

*Hale and Lothrop,* for defendants.

*By the court,* WHIPPLE, C. J. This cause comes before the court upon questions reserved by the county judge of the county of Wayne.

The facts upon which the questions of law arise are as follows: The steam boat Patchin was a boat owned and registered in Buffalo, at the time the plaintiffs did certain work, and furnished materials for the repairing of said boat at the request of the owner or master, by whom the debt was contracted, which is now sought to be recovered. It further appears that the plaintiffs are ship carpenters, residing in Buffalo, where the work was done and the materials furnished. In 1848 the claim of the plaintiffs was exhibited before the county judge, who issued process, by virtue of which the boat was attached at Detroit. A bond was given and the boat released; upon this bond the suit is brought.

The precise question submitted for our determination, is, whether, under our statute, a *lien* attaches when a cause of action accrues for any of the causes specified in the first section of chapter 122, entitled "Of proceedings for the collection of demands against ships, boats and vessels."

It is not to be disguised that the solution of this question is involved in a good deal of difficulty, growing out of the conflicting provisions of the chapter above referred to. In behalf of the plaintiffs, it is conten-

ded that the statute does not give a specific *lien,* but simply provides a new *remedy* for the recovery of demands accruing under the provisions of the first section.   On the contrary, it is insisted by the defendants, that, by section 1, a *lien* attaches and is coeval with the cause of action, and that the other sections provide a *remedy* by which that *lien* is to be enforced.

A brief history of the legislation and judicial decisions on the subject, may be useful in guiding us to a correct conclusion as to the intention of the legislature in substituting chapter 122 in lieu of the pre-existing law.   At the time the present law took effect, the act of 1839 was in force.

By the first section of that act, it was provided, "That every boat or vessel used in navigating the waters of this state, shall be *liable,* &c." To enforce this liability the third and fourth sections provide for the filing of a complaint, and the issuing of an attachment for the seizure of the boat or vessel.   No provision was made by which other claimants under the act could make themselves parties to the proceedings, but each claimant was left to pursue his remedy, without reference to the proceedings that may have been instituted by other claimants.   The result was, that claims arising under the act were satisfied in the order in which the attachments were served.

The first section of chapter 122 provides, that "Every ship, boat or vessel used in navigating the waters of this state, *shall be subject to lien thereon,*" &c.:

1. For all debts contracted by the master, owner, agent or consignee thereof, on account of supplies furnished, &c., &c.;

2. For all sums due for wharfage or anchorage of such ship, boat or vessel within this state;

3. For all damages arising from the non-performance of any contract of affreightment, &c.;

4. For all damages arising from injuries done to persons or property, &c., when the same shall have occurred through the negligence, &c.

Section 2 directs, that "any person having such claim, &c., may make application to any officer authorized to perform the duties of a justice of the supreme court at chambers, &c., for a warrant to *enforce the lien,*" &c.

Section 3 directs the manner in which the application shall be made.

Section 4 authorizes the issuing of a warrant, and the seizure of the vessel, &c., "*to answer all such liens as shall be established against it according to law.*"

Sections 5 and 6 direct the mode of proceeding by the officer charged with the execution of the warrant.

Sections 8 and 9 provide for the publication of a notice for twelve successive weeks, which notice, among other things, shall " require *all persons who claim to have any demand against such ship, boat or vessel,* &c., under the provisions of this chapter, to deliver an account of their respective claims to such officer, within three months from the first publication of the notice, or *that the remedy against such boat or vessel will be forfeited.*"

Section 10 provides, that " any person having any *lien* under the provisions of this chapter, upon the property so seized, may deliver to the said officer an account in writing of his demand, accompanied by such affidavit as is hereinbefore prescribed in relation to the first application for a warrant; *and he shall thereupon be deemed an attaching creditor,* and be entitled to the same benefits, and subject to the same responsibilities, as the claimant at whose instance such warrant originally issued."

Section 11 declares, that " *all liens* under this chapter upon the property so seized, an account of which shall not be presented to the said officer within the time limited in the notice, shall cease."

Sections 12, 13 and 14 provide the mode by which the proceedings against the ship, boat or vessel may be discharged.

Section 12 authorizes the application to be made for such discharge at any time before an order of such sale shall have been made.

Sec. 13 directs a bond to be given, with security, " to the creditors or claimants prosecuting such warrant, in a penalty double the amount of debts or claims sworn to," &c. " conditioned that the obligors therein will pay the amount *of all such claims and demands as shall have been exhibited, which shall be established to have been subsisting liens upon such ship, &c., pursuant to the provisions of this chapter, at the time of exhibiting the same respectively.*"

Sec. 16 authorizes a suit upon the bond so given; and " the attaching creditors respectively shall state in their declaration, their respective demands, averring that the claim therefor *was a subsisting lien*

*on such ship, &c., at the time of the exhibition thereof,* as hereinbefore provided," &c.

After providing for the sale of the ship, boat or vessel, the 23d section directs that distribution of the proceeds shall be made " *among the creditors who shall have exhibited their claims as herein provided.*"

Sec. 36 provides, that " no proceedings under this chapter, *to enforce the liens* AUTHORIZED *by its provisions,* shall be had against any vessel which shall have been seized by virtue of process issuing from any court of the United States having admiralty jurisdiction," &c.; " but nothing in this section contained shall be construed to impair the validity of *any liens created* by this chapter; the payment of which shall be decreed in any court in the United States."

These quotations present, very clearly, the difficulties in the way of reconciling the various sections of the statute under consideration. The conflict is so palpable, as to render it quite impossible to harmonize its provisions, and make each section consistent with every other section with which it stands connected.

With respect to the first section, it is identical with the corresponding section of the act of 1839. The phraseology is slightly changed, but the legal sense is the same. By the first section of the act of 1839, every boat or vessel navigating the waters of this state is declared to be *liable,* &c. By the first sec. of chap. 122, such boat or vessel is *subject to a lien,* &c.

In its largest sense, the word *lien* embraces every case in which property is *charged* with the payment of any debt or duty: to be *charged* with the payment of any debt or duty, is equivalent to being *liable* for the payment of any debt or duty. Either form of expression imports a right *in rem.* And it is important to observe, that the instances in which boats or vessels may be seized, are the same under both statutes. No distinction whatever is made between foreign and domestic creditors; nor does the first section of the present law, any more than that of 1839, confine this right to proceed *in rem,* to debts created or liabilities incurred within this state, except in the single instance where the claim is for wharfage or anchorage. The two statutes are also substantially alike in respect to the mode of proceeding to enforce the claims specified in section one.

By the act of 1839, an attachment issued upon the filing of a com-

plaint, verified by affidavit. By the existing law, a warrant issues; both processes, however, perform the same office. It is true that the *warrant* in the second section is "to enforce the lien of such claim or demand, and to collect the amount thereof." This language would seem to imply that a *specific lien* was intended to be created by the first section of the act, and that as a means of enforcing such lien, a warrant issues to seize the ship, boat or vessel. The same inference is deducible from the fourth section, by which the officer charged with the execution of the warrant, is directed to "attach, seize, and safely keep such ship, &c., to answer all such *liens as shall be established against it, according to law."*

The remaining provisions of the statute of 1846, relative to the mode of executing the warrant; the notice to be given on the return of the same; the proceedings to be had by persons having claims against the ship, boat or vessel under the first section of the act; the manner of procuring the discharge of such ship, boat or vessel; the bond to be given upon such discharge; the remedy and mode of proceedings upon such bond for breach of any of its conditions; the order of sale and mode of conducting the same; and the final distribution of the proceeds;—are a literal copy from the New York statute in relation to "proceedings for the collection of demands against ships and vessels." 2 R. S,. N. Y., tit. 8, p. 404.

That the whole of the New York statute was not intended to be adopted by our legislature, appears very clearly from the provisions of the first and second sections of that statute, which are as follows:

"Sec. 1. Whenever a debt, amounting to fifty dollars or upwards, shall be contracted by the master, owner, agent or consignee of any ship or vessel, *within this state,* for either of the following purposes:

"1. On account of any work done, or materials or articles furnished, *in this state,* for or towards the building, repairing, fitting, furnishing or equipping such ship or vessel;

"2. For such provisions and stores furnished, *within this state,* as may be fit and proper for the use of such vessel at the time the same was furnished;

"3. On account of the wharfage and the expenses of keeping such vessel *in port,* including the expenses incurred in employing persons to watch her;

" Such debt *shall be a lien* upon such ship or vessel, her tackle, apparel and furniture, and shall be preferred to all other liens thereon, except mariners' wages."

" Sec. 2. When the ship or vessel shall depart from the port at which she was when such debt was contracted, to some other port within this state, every such debt shall cease to be a lien at the expiration of twelve days after the day of such departure; and in all cases such lien shall cease immediately after the vessel shall have left this state."

The difference between these provisions and those embraced in the first section of chapter 122 of our statute, are striking and very material. That a debt contracted for the purposes specified in the first section of the New York statute, was intended to be a *specific lien,* is quite obvious from the language of that section. It is declared, in express terms, that " such debt *shall be · a lien* upon such ship or vessel, and shall be preferred to all other liens thereon, except mariners' wages."

The second section is equally explicit, by declaring the circumstances under which the lien created by the first section shall cease. We have already said that the first section of our statute is the same, in legal effect, with the corresponding section in the act of 1839, and makes ships, boats and vessels navigating the waters of this state, " *subject to a lien*" for the debts specified in that section.

The language of the first section of our act, unlike that in the first section of the New York statute, does not, *necessarily,* import a lien. It is not said that " such debt shall be a lien;" but declares that, for certain debts, every ship &c. " shall be subject to a lien." By the New York law, the lien is created when the debt is contracted; by our law, such a consequence does not, of course, follow, unless it appears from an inspection of the whole act that such was the intention of the legislature.

But the great distinction between the New York and Michigan statutes, consists in this: that by the first section of the New York statute the debt, in order to be a charge upon a ship or vessel, must have been contracted within the state; while the first section of our statute imposes, in *express terms,* no such restriction. If such a restriction was intended, it must be inferred by construing the first section with other parts of the statute.

The reason for confining the lien to domestic debts, and declaring that

such lien shall cease when the ship or vessel leaves the state, has its foundation in a wise policy. The legislature of New York were aware, that to continue a lien after the ship or vessel has left their state and entered another sovereignty, would be productive of great mischief. No person exercising ordinary prudence would venture to contract for the purchase of a ship or vessel built in the state of New York, or owned by its citizens, if such ship or vessel, when she crossed the line which divided the jurisdiction of that state from another, continued to be burdened with liens created by the laws of the state where such ship was built, or by whose citizens she may be owned. A citizen of Michigan, in making such a contract, has in view the laws of the state where the contract is made. It would be unreasonable that he should be required to ascertain whether, by the laws of another sovereignty, the ship or vessel is encumbered with liens created by the laws of such sovereignty. He has a right to presume that the state of New York would not give to her local laws, intended for the benefit and protection of her own citizens, an operation beyond the limits of her own territory. That state fulfilled its whole duty to its citizens, when it gave a lien on ships and vessels *within the state,* for a debt contracted *within the state.* If the creditor allows the ship to leave the state, it is but just to citizens of other states, that the rights conferred by the law of the place where the debt was created, should cease.

I have already said that the first section of the existing statute was borrowed from the corresponding section in the act of 1839. That section has received a judicial construction from this court. We held in 1842, that no lien was created under its provisions, until the ship, boat or vessel was actually seized by an attachment. The views expressed in 1842 were re-affirmed in 1849, after the most mature deliberation. Robinson *v.* Steam Boat Red Jacket, Ante 171.

The question then decided is not now open to discussion or review, especially as the opinions we then expressed have been concurred in by the highest courts in several of the states where the same statute exists. The important question decided in 1842 and 1849 was, that the act of 1839 was intended to afford a new and more efficient remedy for the collection of a certain class of debts, than was given at the common law. We repudiated the idea that the benefits secured by that act were intended exclusively for our own citizens; but held that the stat-

ute was purely remedial, and that citizens of other states might avail themselves of its provisions, and enforce their claims, whether those claims originated in Michigan or in a sister state.

The counsel, in arguing the case before us, do not pretend to controvert or impugn the correctness of the views we expressed in 1842 and 1849, but contend, very earnestly, that, while those views may be sound when applied to the act of 1839, they are inapplicable to a law essentially different, and which was substituted for that of 1839. It was urged, that while that act conferred no exclusive benefits upon our own citizens, that the law now in force was intended to secure to them rights to the exclusion of citizens of other states.

That it is competent for a legislature to confer upon its own citizens peculiar rights, is not denied. In doing so, however, they are supposed to be controlled by reasons so overwhelming, or views of policy so just, as to commend its action to the approval of the wise and the enlightened.

Is it consistent with justice, that rights secured to our citizens by the act of 1846, should be denied to the citizens of a sister state? Is there any more sacredness attached to a claim which a citizen of Michigan may have, for having supplied a boat with a barrel of flour, than to the claim of a citizen of Buffalo, who has supplied the same boat with a quarter of beef? The moral obligation to pay the claim, is just as binding upon the owners of the boat in the one case as in the other. The nature of this *obligation* remains the same whether it was incurred at Buffalo or Detroit. Why, then, should not their legal rights and remedies be the same in any forum where that obligation is sought to be enforced?

This question admits of but one answer. A liberal and just policy would seem to require that the remedies provided for our citizens, for the vindication of their rights or the redress of their wrongs, should not be denied to the citizens of a sister state, who may appeal to our judicial tribunals for justice. But would the construction contended for by the defendants, confer a benefit upon our citizens? It is contended that the person who furnishes supplies, the mechanic who performs labor, the material-man who provides materials, for any ship, boat or vessel, would have a lien on such ship, boat or vessel. The same section, however, contemplates a lien in favor of those who may be entitled to dam-

ages for the non-performance of any contract of affreightment, or of any contract touching the transportation of persons or property; and for all damages arising from injuries done to persons or property by any ship, boat or vessel, where the same shall have occurred through the negligence or misconduct of the master or hands employed thereon.

Contracts of affreightment, and for the transportation of persons and property, are in nine cases out of ten made without the state; and as we cannot give to our statute an extra-territorial operation, it would follow, that the large and important class of cases specified in the third subdivision of section one, would be excluded from the benefits of the statute.

The same remarks will apply to cases arising under the fourth subdivision. If, through negligence, the goods of a merchant, which may include his entire fortune, are lost, ten rods beyond the line which separates our jurisdiction from that of Ohio, he can have no claim to the benefits of the statute. So if, through like negligence, one of our citizens loses a limb, by the explosion of a boiler, he can claim no rights under the statute, if the injury occurred within the jurisdiction of another state.

These are facts which the legislature must be presumed to have known; and however they may have been disposed to draw a line of distinction between our own citizens and the citizens of other states, we are not justified, except the contrary manifestly appears, in supposing that rights were intended to be conferred upon one portion of our citizens which are denied to others. This distinction the legislature have not made in the first section of the act in question. By that section, a remedy is given for the enforcement of rights and the redress of injuries, of which every citizen of our own state, and those of other states, may claim the benefit.

But there is another, and it seems to me almost conclusive view to be taken of the question I am now discussing. The second subdivision of section one is in these words: " For all sums due for wharfage or anchorage of such ship, boat or vessel *within this state.*"

It may be asked with emphasis, whether the restrictive words, "within this state," would not have been found in the other subdivisions of the same section, if the legislature intended to confine the remedy to

contracts made or injuries received *within the state.* The fact that these words are to be found in the second subdivision, indicates that they were intentionally omitted in the first, third and fourth subdivisions of the same section. And this inference would be irresistible, if the language of that section was not controlled by other provisions of the act, to which I have adverted, and which I now propose briefly to examine.

The second section authorizes the issuing of a warrant " to enforce the liens," &c. This would imply that the seizure of the vessel, by virtue of the warrant, did not *create the lien,* but that the object of the seizure is to *give effect to an existing lien.* The tenth section is equally explicit. Any person *having a lien* upon the property seized, is to deliver to the officer an account in writing of his demand, duly verified: it is not the delivery of the demand, thus verified, which gives the lien; for by the words of the act, no person is authorized to file his demand, unless he has a *subsisting lien.*

The same inference is to be drawn from section 11, which declares that all *liens* shall cease, an account of which shall not be delivered to the proper officer within a specified time. The condition of the bond given under section 13 is susceptible of but one construction. The obligors therein bind themselves to pay all such demands as shall have been exhibited, and which shall be established to have been *subsisting liens* upon such ship, boat or vessel, " *at the time of exhibiting the same respectively.*" This language is unambiguous, and clearly imports that a lien actually subsisted at the time of exhibiting the claims specified in the first section. Section 36 shows, very conclusively, that the object of the proceedings is not to *create,* but to *enforce liens.*

If any doubt existed as to what the legislature intended, judging of that intention by what appears on the face of the act itself, that doubt must vanish when we come to consider, that in an action upon the bond given under section 13, the attaching creditor must aver that his claim was a *subsisting lien* on the ship, boat or vessel, *at the time the same was exhibited,* as provided by section ten. If the averment is made necessary by the statute, it must be proved on the trial: this the claimant could not do, if, as contended by the plaintiffs, the boat was not subject to a lien when the claim was exhibited. We cannot attribute to the legislature the folly of requiring the plaintiff to aver, and prove a fact, when by the terms of the statute no such fact existed.

Bidwell *et al. v.* Whitaker *et al.*

Whatever, therefore, may be our views respecting the interpretation to be given to the first section, separately considered, or whatever opinions we may entertain respecting the impolicy of confining the remedy given by the statute to contracts or injuries arising within this state, we are constrained to say, that, construing the first section in connection with the other sections of the same act, a *specific lien* is given by that section, and that the other sections provide a remedy by which it is to be enforced.   I have struggled to arrive at a different conclusion, believing, as I do, that a policy more liberal and enlightened towards citizens of other states ought to prevail, and knowing full well that this conclusion will exclude from the benefits of the statute a large class of our own citizens, from rights secured to others.

But the *inferences* to be drawn from a literal interpretation of the first section, must be controlled by the clear and express language to be found in other sections of the same statute, although the policy of the act may to some extent be defeated.   It is only when a statute is ambiguous in its terms, that courts exercise the power of so controlling its language as to give effect to what they may suppose to have been the intention of the law maker.   In the statute now before us, the language admits of but one construction.   No doubt can arise as to its meaning.   It must therefore be its own interpreter.   We are not permitted to look out of, or beyond it, to ascertain whether the legislature may not have intended what, upon the face of the statute, they have failed to express.

*Certified accordingly.*