## Philo Parsons and another v. George B. Russell and another.

The provision in the Constitution that "No person shall be deprived of life, liberty or property without due process of law," as applied to proceedings of a judicial character, was intended to secure to the citizen the right to a trial, according to the forms of law, of the questions of his liability and responsibility before his person or his property shall be condemned.

The trial must be by an impartial tribunal, and judgment must precede the deprivation of property.

Under the Boat and Vessel Law of this State, a vessel may be seized and sold upon the mere assertion of a debt or demand, without any proof to substantiate the claim being made before a judicial tribunal, and without any judgment or decree of any such tribunal allowing the sale. It is therefore in conflict with the constitutional provision above quoted, and void.

*Heard May 29th and 30th, 1862. Decided January 13th.*

Error to Wayne Circuit.

Plaintiffs in error brought action upon a bond given by defendants in error for the release of the steamer Illinois, which had been seized under the Boat and Vessel Law, so called (chapter 149 of Compiled Laws), on a warrant issued by T. S. Blackmar, a Circuit Court Commissioner of Wayne county. The bond was conditioned for the payment to plaintiffs in error of the sum of $761 96, the amount of their claim for which the boat was seized.

The defendants' demurred to the declaration, assigning several special causes; but as the constitutionality of the Boat and Vessel Law was the only question considered by this Court, an abstract of the pleadings is not given. The Circuit Court gave judgment for defendants.

*Maynard & Meddaugh,* for plaintiffs in error:

1. The Act is presumed to be constitutional, and, unless satisfied beyond all serious doubt of its conflict with *some provision* of the Constitution, the Court must sustain it: — *Sears v. Cottrell,* 5 *Mich.* 252; *People v. Tyler,* 8 *Mich.* 320; 1 *Mich.* 176 and 508; 4 *Mich.* 244.

The defendants claim that the section of the Boat and Vessel Law, which provides for the sale before the claimants' demand has been adjudicated, infringes that article of the Constitution which provides that "no person shall be deprived of life, liberty, or property, without due process of law." This involves the question, what is due process of law? The provision came from Magna Charta. The evil which it was intended to remedy was to prevent the King

PARSONS v. RUSSELL.

from causing his subjects to be imprisoned and their property confiscated without any regard to legal forms or usages. It was forced from him to prevent the future exercise of such illegal and oppressive power.

In construing any law we must look at the mischief or evil which it was intended to remedy. Applying this rule, "due process of law" could only have been intended to prohibit special acts of the Legislature, and not a law general in its application and affecting the rights of all alike. Such was the construction given to this provision in the case of *Sears v. Cottrell; Ervine's Appeal,* 16 *Penn.* 256; *Matter of John and Cherry Streets,* 19 *Wend.,* and numerous other cases.

2. There are quite a number of cases that give to the words "due process of law" a different construction, and hold that they mean a trial before some judicial tribunal, and the rights of the parties first settled. Judge Curtis, in 18 *How.* 276, says, we must look to the settled usages and modes of proceeding existing in the common and statute laws of England, before the emigration to this country, to ascertain their meaning, unless they are defined in the Constitution; and holds that such a construction as was given to them in *Sears v. Cottrell* makes the provision a nullity. If he is correct, then the People, by the adoption of the Constitution, have deprived themselves of the power to pass any law that materially changes the judicial proceedings then in use.

If they mean a trial before some magistrate or judicial tribunal, and the rights of the parties first settled by a judgment, then many of our special statutory proceedings must be condemned. Our attachment process is unknown to common law, and under it, the defendant is deprived of the *possession* and *use* of his property before trial or judgment. If the attachment law is constitutional and this is not, then, to deprive a person of the possession, use and control of his property before judgment, is "*due process*

*of law*," but to go a step further and sell the property
is not "due process of law." The statute providing for
the sale, on the order of the court, or a judge thereof,
of animals or perishable property taken in attachment, is
open to every objection that can be urged against the law
in question.

The fact that the sale of perishable property when
attached is *necessary*, as well for the interests of the debtor
as the creditor, only goes to the *policy* of the act, and
not to the *power* of the Legislature. The limitations or
restrictions upon the law-making power do not yield to
any considerations of expediency or necessity. There is no
soundness in the argument that the construction given to
the words "due process of law" in *Sears v. Cottrell*, ren-
ders the limitation a nullity. It prohibits the passage of
any special law to affect injuriously the rights of particular
individuals, *as such*. Such a law would manifestly not be
"the law of the land." A proper definition involves the
idea of generality—it being the *law of the land* in con-
tradistinction to the *law of individuals*. The controversy in
reference to the meaning of this clause—"due process of
law"—had its origin, no doubt, in the fact that not
unfrequently harsh, cruel, and oppressive laws have come
before the Courts of the several States, and seeing no
other remedy in the Constitution, this provision has been
construed into a sort of all-healing ointment. But it is
said if "due process of law" is to have the meaning we
seek for it, then the Legislature have absolute power;
that they have only to make their acts general and they
must be submitted to. If this would be so, it should have
no influence on the construction of this or any other pro-
vision of the Constitution. The Constitution vests in the
Legislature the entire law-making power, subject to the
limitations therein specified. They are the direct represen-
tatives of the People, the delegates of their power, and,
except for the limitations of the Constitution, are as absolute

in power within their proper sphere as the People themselves. But the proposition does not follow from the construction we claim. The law must not infringe any of the limitations of the Constitution, whether directly expressed, or necessarily implied from the positive duties enjoined. A law perhaps utterly repugnant to justice and reason might be treated as a nullity — especially if the decision of our Courts furnished any fixed and certain standard that such was its character. To hold that an act of the Legislature is void because the power which would authorize its passage would also authorize the passage of some supposable ridiculous enactment, is a most unjudicial and dangerous mode of reasoning. But if the Constitution furnishes no safeguard against such legislation, let us not seek a remedy more dangerous than the evil itself. An unauthorized construction of the Constitution to meet some extreme case, would furnish much greater cause for anxiety than *any general legislative act.*

The Boat and Vessel Law was in existence in this State long before the adoption of our present Constitution, and was copied from the statutes of a neighboring State, where it has been in operation for many years, and its constitutionality appears never before to have been questioned, either there or here. This should lead the Court, before pronouncing the law void, to examine carefully, lest its apparent harshness should carry them beyond the true province of their duty. There is no conflict between this act and the act of Congress of 1845, as the latter expressly reserves to the parties the right to every concurrent remedy given by the State law.

But even if the law is unconstitutional, the defendants having voluntarily given the bond to secure the release of the vessel are estopped from denying the validity of the process: — 2 *W. & S.* 517; 14 *B. Monr.* 41; 1 *Black.* 331; 21 *Wend.* 337; 3 *Hill,* 47.

*A. Russell*, for defendants in error :

The Boat and Vessel Law is unconstitutional.

1. As against common right and the law of the land, because it deprives a man of his property without due process of law.

It provides (§§ 18, 23), that the vessel shall be sold, unless bonded, after three months advertisement, and that the proceeds shall be brought in for *distribution*. Then, *and not till then*, is an opportunity given to contest the demand of the plaintiff. The defendant has no day in court, no opportunity to be heard, until his property is taken away from him.

The principle involved in the sale of perishable articles furnishes no analogy. Take the case of a vessel owned in Oswego, seized here, and a failure to procure bondsmen through want of acquaintance or property in this State. The representative of an investment of $50,000 may rot for three months, on a baseless claim, and the owner may have the satisfaction of receiving at last from the com-missioner a pittance brought on a forced sale, *less the costs !* See *Const. Art. VI.* § 32 ; *U. S. Const. Amend-ments, Art. V ; Magna Charta*, §§ 29, 46 ; *Coke*, 2 *Inst.* 46 ; *Sedg. Stat. & Const. L.* 534, 610 ; 2 *Story, Const.* § 3789 ; *Ervine's Appeal*, 16 *Pa. St.* 256 , 4 *Dev.* 15 ; 10 *Yerg.* 59 ; 18 *How.* 272.

The remarks of the Court in *Sears v. Cottrell*, 5 *Mich.* 254, I submit, do not conflict with this view. The mere fact that a law is a general law, operating upon all alike, is not, of itself, inconsistent with its being a law which deprives a man of his property without due process of law. A law, for instance, declaring that no evidence should be given on the part of the defendant in any court in this State, would certainly be a general law, and yet glaringly unconstitutional. The law of the land is not only a general law, but "a law which hears before it condemns, which

proceeds upon inquiry, and renders judgment only after trial." Now, this law hears the *complaint* only, and then condemns property to be sold before inquiry and before trial. To be sure, it stops short of handing over the proceeds to the plaintiff, but it deprives the owner of property of that property *in specie;* and the guaranty in the Constitution to a man of his property, means, beyond question, his property *in specie,* and not its money value. Property and money are not convertible terms.

Story defines "due process," etc., as "being brought in *to answer,*" etc. This also means much the same as "agreeably to the principles and usages of law" found in may statutes, *e. g., U. S. Jud. Act.* § 14 ; and these *principles and usages* form the substratum of all State and Federal laws:— *Marshall Ch. J., Burr's Trial; Lorman v. Benson,* 8 *Mich.* 18; *Stout v. Keyes,* 2 *Doug. Mich.* 184; *Chase v. Hathaway,* 14 *Mass.* 224; *Hibbard v. People,* 4 *Mich.* 125; *Brooks v. McIntyre,* 4 *Mich.* 316 ; *Greene v. Briggs,* 1 *Curt. C. C.* 311: and the language of Christiancy J., 5 *Mich.* 261, is only an amplification and illustration of "against the law of the land."

I have said the law stops short of handing over the proceeds of the vessel to the plaintiff without any trial. But it does what is worse even than that would be. It compels the vessel owner to pay out of the proceeds of the vessel all the costs made by the plaintiff, even if, upon trial, it turns out that the latter had no ground whatever for causing the seizure (§§ 21, 29). This law, indeed, comes up to the extreme case supposed by Christiancy J., 5 *Mich.* 261. I submit that in the language of the Court in *Tyler v. The People,* 8 *Mich.* 333, affirming *Sears v. Cottrell,* the Court can "lay its finger on the part of the Constitution violated," and that "the infraction is clear, and free from a reasonable doubt."

2. As practically establishing an Admiralty Court.

PARSONS v. RUSSELL.

[The point not being considered by the Court the argument upon it is omitted.]

Giving the bond does not estop the defendants below from setting up that the law is void. The bond is not entered into voluntarily, but from compulsion. The proceeding is *in invitum*. Herein it differs from bonds given in attachment, replevin, &c., where the plaintiff voluntarily avails himself of a statute, and reaps a benefit, and hence can not set up defects in the law or proceedings when sued on the bond, or even want of jurisdiction. The essence of estoppel is the *admission*. Now, the obligors in this bond admit nothing. No recital but that of the seizure is necessary.

What is the consideration of the bond? Evidently, the legal obligation created by the statute. If the law was invalid, and there was *no* legal obligation resting upon the vessel owner to leave his property in the sheriff's hands, unless he gave the bond, there was no consideration.

The only recovery there can be on the bond is by establishing " a subsisting lien." Now, there is no lien, if the remedy, provided by the law, is unconstitutional. A lien being declared and a remedy prescribed, that remedy is *exclusive*. If a lien had been declared and no remedy provided, it could probably have been enforced in chancery. But, as it is, if the remedy is held void, the whole law must fall, and there is no existing or subsisting lien which can be estimated on the bond. It is like the case of a crime declared, with a punishment affixed, which is held unconstitutional. Manifestly, there is then, thereafter, no crime triable in court.

MARTIN CH. J.:

The constitutionality of the Boat and Vessel Law is the first question to be considered in this case, for if the law be found to be unconstitutional the plaintiffs have no standing in Court, and all the minor questions raised by

the record are unimportant. It is contended by the defendants that the law violates that provision of the Constitution which declares that no person shall be deprived of life, liberty or property without due process of law.

Whatever may be the difficulty of defining this phrase of the Constitution when sought to be applied to other proceedings, when used in relation to those of a *judicial.* character it is evidently, and has been so universally held, intended to secure to the citizen the right to a trial. according to the forms of law of the questions of his liability and responsibility, before his person or his property shall be condemned. Judicial action is in such cases imperatively required, and "implies and includes *actor, reus, judex*—regular allegations, opportunity to answer, and trial. according to some settled course of judicial proceedings." While we adopt the common law, or, to speak more accurately, so long as we recognize and submit to it, we recognize and adopt the fundamental principle that no man shall be party and judge in his own case: that if tried it it shall be by his peers, and if deprived of liberty or property it shall be by impartial judicial authority, after a trial and judgment under general laws. The right to enforce private rights must necessarily be through the intervention of courts of justice, and in the enforcement of contracts, at the least, a trial by jury, or according to some universally established practice of courts, has always been guaranteed to determine the respective rights and liabilities of the parties, and property has been protected from sale until these rights and liabilities have been judicially ascertained and determined. The Boat and Vessel Law ignores this principle, and confers upon a claimant a right to condemn and sell a boat or vessel, upon his bare assertion of a debt or demand, without requiring any proof to substantiate it to be made before any judicial tribunal, or requiring any judgment or decree of such tribunal to be made after a trial or investigation of the demand. Thus a vessel may

be sold upon an assertion of the existence of a demand, which may be absolutely false and unfounded. Certainly the spirit and genius of our laws, as well as the letter of the Constitution, will not tolerate this outrage upon the rights of property. The law gives no hearing to the defendant until the whole property is disposed of, and if no debts are established, the consequences are just the same as if they had been. In either event he is deprived of his property, and this before trial and judgment. The vessel owner has no means of maintaining his property, although there may be no shadow of a claim against him. It is no answer that he may bond it, for by reason of absence, or other cause, he may be in neither the position or condition to do so. The whole proceeding to the sale may be conducted in his absence, or without his knowledge. The statute does not require personal service to be made, or attempted to be made upon him or any person. It is in the nature of a proceeding *in rem*, and a condemnation of the property before trial and judgment; the consequences of which can not be obviated by any judicial act.

There is no analogy between this case and those of the sale of property for non-payment of taxes, or other revenue purpose, for this is really the act of the creditor or claimant, while the other is the act of the government in the exercise of pre-eminent sovereignty to which all other rights are subordinate; a right necessary for the protection and preservation of the government: neither is that the exercise of a judicial right or form; and to this alone is our attention directed in this case. Nor is there any analogy between this law, and that authorizing the sale of perishable property seized under the attachment law; as in the latter case the judgment or order of a court is requisite before a sale can be made. A sale of perishable property is only allowed to prevent the loss which would necessarily accrue from not selling; and the object is to protect the rights of all parties by a resort to the only mode to obtain any bene-

PARSONS *v.* RUSSELL.

ficial use from the property. In this case of the sale of perishable property *pendente lite*, and in every instance of the exercise of such a power within my recollection of the authorities, such power is exercised upon the order of a court of competent jurisdiction before which the parties are, or may be, heard, and after due notice.

But the effect of this law is the absolute destruction of the title and right of the owner of the boat or vessel against which proceedings are instituted, by the *ex parte* act of one claiming to have a demand which is by law declared to be a lien upon such boat or vessel. That the law may declare any and all contractors for the building, furnishing and supplying vessels to have liens upon such vessels by reason thereof, is not questioned; but we deny that the law thereby makes the contractor a judge in his own case, so far as to enable him to divest the owner of his property, through the ministerial acts of a Circuit Court Commissioner, or a Judge at chambers, without judicial investigation and determination of his right and the consequent liability of the vessel or its owner.

Holding the law in this respect to be unconstitutional, the judgment is affirmed, with costs.

CHRISTIANCY and CAMPBELL JJ. concurred.

MANNING J.:

I can not agree with my brethren in holding the statute or any part of it unconstitutional.

It has long been on our statute book. It is not a new law just enacted. It made its first appearance in our State in the Revision of 1846. From that time to the present—sixteen years and upwards—it has been regarded by our courts and parties having occasion to act under it as the law of the State. Questions have frequently arisen under it, some of which have been brought to this Court for adjudication. *Lawson v. Higgins*, 1 *Mich.* 225 ; *Bidwell*

*v. Whittaker*, 1 *Mich.* 469; *Watkins v. Atkinson*, 2 *Mich.* 151; *Truesdale v. Hazzard*, 2 *Mich.* 344; *Turner v. Lewis*, 2 *Mich.* 350; *Ward v. Wilson*, 3 *Mich.* 1; and *Wight v. Maxwell*, 4 *Mich.* 45, are cases of this description. In each of these as in the case before us the action was on a bond given under the statute to release the vessel. In no one of them was the constitutionality of the statute questioned.

As every statute is presumed to be constitutional, there must be a period in the existence of a statute when that presumption becomes conclusive by lapse of time, the accumulation of rights under it, and its recognition by the judiciary.

In *Stuart v. Laird*, 1 *Cranch*, 299, it was objected that the Judges of the Supreme Court of the United States could not hold the Circuit Courts, under the Constitution. The Court say: "To this objection, which is of recent date, it is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistable answer, and has indeed fixed the construction."

We find a similar statute in the State of New York— open to the objection that in the opinion of my brethren is fatal to our statute — as far back as 1829. See 2 *R. S. of that State, p.* 492. This statute is still, we believe, in force there, and we are not aware that its constitutionality has ever been brought in question in the courts of that State.

To an intelligent discussion of the constitutional question it will be necessary to state most of the provisions of the statute.

The first section makes debts contracted on account of supplies and provisions a lien on the vessel. The other sections provide the machinery for enforcing the lien.

Section second names the officers to whom application may be made for a warrant to seize the vessel.

The application is to be in writing, to specify the par-
ticulars of the demand, and in whose favor it accrued, and
the amount due over and above all payments and discounts;
*and it is to be verified by the affidavit of the creditor or
claimant, or of some other credible person having a know-
ledge of the facts*, § 3.    The warrant is to the sheriff or
constable, and commands him to seize and safely keep the
vessel, its tackle, apparel and furniture, to answer all such
liens as shall be established against it according to law,
and to make a return of his proceedings to the officer
issuing the warrant within ten days after the seizure, § 4,
The sheriff is to keep the vessel to be disposed of as
directed by the act, § 5.    He is to make a return stating
particularly his doings, and to make, subscribe and annex
thereto a just and true inventory of the property seized,
§ 6.    No other warrant is to issue against the vessel unless
the first warrant is suspended, § 7.    On return of the war-
rant the officer issuing it is to cause a notice to be published
in a newspaper, &c., once in each week for twelve successive
weeks, § 8.    The notice is to state: 1st. The issuing of the
warrant, and the name of the vessel seized or a description
of it, and if known to the officer, the port or place to which
she belongs, and the name of the last commander: 2d. It is
to require all persons who claim to have any demands
against the vessel, her tackle, apparel or furniture, under
the provisions of the act, to deliver an account of their
respective claims to such officer, within three months from
the first publication of the notice, or that their remedy
against the vessel will be forfeited: 3d. That such vessel,
her tackle, apparel and furniture, will be sold for the pay-
ment of the claims against it, unless the owner, consignee
or commander thereof, or some person interested therein,
appear and discharge such warrant according to law, within
three months from the first publication of such notice, § 9.
Any person having a lien under the act, on delivering, at
any time within the three months, an account in writing

of his demand to the officer issuing the warrant, verified by affidavit as in the case of an application for a warrant, is to be deemed an attaching creditor, § 10. All liens not presented within that time are to cease, § 11. The owner, consignee, agent or commander, or any person interested in such vessel, may at any time before an order for the sale of such vessel is made, apply in person or by an attorney, to the officer who issued such warrant, for an order to discharge the same, § 12. The applicant is to execute and deliver to the officer to whom the application is made a bond to the creditors or claimants prosecuting the warrant, in a penalty double the amount of debts and claims sworn to, with such security as shall be approved by the officer, conditioned that the obligors will pay the amount of such claims and demands as shall have been exhibited, and which shall be established to have been subsisting liens on such vessel at the time of exhibiting the same, § 13. On the delivery of such bond the warrant is to be discharged, and the claimants' remedy for the recovery of their several demands is on the bond, § 14. If the claims are not satis- fied, and the warrant is not discharged within the three months, the officer issuing the warrant, within one month after the expiration of the said three months, upon due proof of the publication of the aforesaid notice, is to issue his order for a sale of the vessel with her tackle, apparel and furniture — stating in the order the amount necessary to be raised to satisfy the claims and expenses, and modi- fying the order to a sale of the tackle, apparel and furniture only, if it should appear they would sell for enough to pay that amount, §§ 18, 19. He is at the same time to order a notice to be published for three successive weeks, requiring all persons who had exhibited claims, and the owner, agent, consignee, master, and all other persons interested in the vessel, to appear before him at a day to be specified, not less than thirty nor more than forty days from the first publication of the notice, to attend a distribution of the

proceeds of the sale, § 22. On the day appointed in such notice, he is to hear the allegations and proofs of the parties, and make distribution of the proceeds arising from the sale, after deducting the expenses, among the creditors who have exhibited their claims, unless the claims of such creditors, or some of them, should be contested by the owner, agent, consignee or master of such vessel, or by some one of such creditors, § 23. The objections to a claim to be in writing, and on request to be tried by a jury, §§ 24, 26. The proceeds, if insufficient to pay all of the claims, to be divided pro rata; if more than sufficient the surplus to be paid to the owner, agent, consignee or master. It is unnecessary to notice the other provisions of the act, as they have no bearing on the question before us.

The action is on a bond given under section thirteen of the act, to release the vessel. It is not an action by the owner for the vessel or value, after a sale under the eighteenth section. It is this last section, and not the one under which the bond was given, that is complained of as unconstitutional. The ground of the complaint is, that it directs a sale of the vessel before the amount due to the claimant has been judicially ascertained.

Conceding, for the present, that the objection is well taken: as the vessel was not sold, and as no proceedings were had under that section, what has it to do with the present action?

No principle of law is better settled than that a statute may be good in part, and bad in part. So far as a statute is in contravention of the Constitution it is a dead letter. But the whole of a statute is not necessarily inoperative because a part of it may conflict with the Constitution. The unsoundness may so far permeate the whole statute as to have that effect; as where the sound and unsound parts cannot be separated; or being separated, the sound parts are so disjointed and disconnected as to be of no use for the want of a common ligament to hold

them together, and to serve as a medium of action. The statute under consideration is not of this character. The eighteenth section is not the seat of vitality; it is a limb that may be lopped off without extinguishing the vital spark. The lien would survive. Only one of the two modes provided for enforcing it would be lost by the excision. If both were destroyed thereby would the lien itself perish? Would not the common law come to its rescue? It would if the statute had created the lien without saying anything of the remedy. The Legislature having given the right, and failed in the means provided for enforcing it, whether by reason of the Constitution or otherwise, must the principal itself fall with the incident? the right with the statute made to enforce it? It would be a strange freak of legal ethics that would lead to such a conclusion. It would be catching at a straw, not to save life, but to ensure its extinction.

The act prescribes two ways for enforcing the lien after the vessel has been seized. One, by sale of the vessel under the eighteenth section; the other, through the bond given under the thirteenth section, to release the vessel from the custody of the sheriff. But one of the two is open to the party instituting the proceedings, while it is left optional with his adversary to force him upon the other.

The question, therefore, is not the constitutionality of the eighteenth section, for its powers have not been invoked. Nothing has been done under it. And, if it would in a subsequent stage of the proceedings, have blocked up the way and arrested all further progress on the part of the plaintiff, the defendant has voluntarily relieved him of the embarrassment, by forcing him to leave the path in which he was traveling, for one not beset with like difficulties. I say voluntarily, for there was no coercion, in the legal sense of that word, in giving the bond. It was not given by defendant under protest, but under

a right claimed and secured to him by the act itself. Plaintiff had nothing · to do with receiving it. How can he, therefore, be charged with having procured it from defendant by coercion? It was forced on him by defendant. The acceptance of the bond was no more a voluntary act on his part than the giving of it was voluntary on the part of the defendant. Neither was in the power of the other. Both acted under the statute.

If we strike out the eighteenth section, and all that relates to the sale, the right to take and detain the vessel at the expense of the owner, until the bond is ' given or the debt is paid, is still left. A remedy that would, in most cases, be as likely to prove efficacious, by depriving the owner of the use of his vessel, as a sale after four months under the eighteenth section.

But, is this eighteenth section and the parts of the act supplementary to it unconstitutional? I think not.

It is said to be in conflict with that part of the State Constitution which declares, that no person shall " be deprived of life, liberty or property, without due process of law."—*Art.* 6, § 32.

This constitutional provision is borrowed from Magna Charta—not the language, but the idea, or principle. The phraseology is a little different, but the one great idea expressed is, that no one shall be deprived of life, liberty or property, except in pursuance of law. The language of the Great Charter is, *by the law of the land;* which Lord Coke, in commenting on the Charter, paraphrased *due process of law.* The two phrases, therefore, mean the same thing. And, history shows us, with the clearness of a sunbeam, the meaning of the former, and that it was not intended to protect the subjects of the King against the legislation of · Parliament, but against the illegal and arbitrary acts of the king and his government.

Blackstone, in speaking of Magna Charta, says, it " confirmed many liberties of the church, and redressed many

grievances incident to feudal tenures, of no small moment at the time; though now, unless considered attentively and with this retrospect, they seem but of trifling concern. But, besides these feudal provisions, care was also taken therein to protect the subject against other oppressions, then frequently arising from unreasonable amercements, from illegal distress, and other process, for debts or service due to the Crown, and from the tyrannical abuse of the prerogative of purveyance and pre-emption." He then proceeds to speak of its several guarantees, and concludes as follows: "And, lastly (which alone would have merited the title that it bears, of the Great Charter), it protected every individual of the nation in the free enjoyment of his life, his liberty, and his property, unless declared to be forfeited by the judgment of his peers, or the law of the land." 4 *Black. Com.* 423-4. This great charter, he tells us, in another place, "was obtained sword in hand from King John."

This subject is so well presented historically, in the American Cyclopedia, under the head of Habeas Corpus, that I cannot refrain from extracting part of the article for its bearing on the subject under discussion. It is in these words: "Personal liberty was always asserted by the common law from its earliest ages; and it was always assailed by kings who would be tyrants; and, with an earnestness proportioned to their tyranny. Hence it became necessary to declare this principle in the most solemn manner in Magna Charta. It is there said, that 'no man shall be taken or imprisoned but by the lawful judgment of his peers, or by the law of the land; and, this clause, more than any other, has given to that instrument the name of the Palladium of English liberty; a name which is deserved rather by the writ of habeas corpus. For, on the one hand, the greater charter did not enact this as a new rule of law, but only declared it to be the law of the land; and on the other its force and influence gradually faded, in despite of repeated formal

confirmations; and this law became actual and operative only by means of the habeas corpus. This writ was issuable from the King's Bench, and it was used to protect or restore liberty, by bringing the prisoner before the court, whose duty it was to order him immediately discharged if he were not restrained of his liberty according to law. But it was evaded by courts and sheriffs who were disposed to support royal or ministerial usurpations; and it became so powerless, that early in the reign of Charles I. the Court of King's Bench formally decided that they had no power to release any person imprisoned without any cause assigned, if he were imprisoned by the express command of the King, or by the Lords of the Privy Council. The Petition of Right, of the third year of the reign of Charles I. (1628), asserted this illegality of the decision, and declared that no freeman should be imprisoned or detained without cause shown, to which he may make answer according to law.' But the means of enforcing this rule were still imperfect, and personal liberty was still violated; and by 16 Chas. I., ch. 10, various provisions were enacted, intended to make the writ of habeas corpus more effectual. But this was not enough. The judges still contrived to refuse the writ at their pleasure, or to insist it could be issued only in term time, and prisoners were sent to distant gaols, and sheriffs and gaolers refused to obey it; or if the party imprisoned were brought before an examining court, his liberty was still withheld on frivolous pretences. At length, in the 31st year of the reign of Charles II. (1679), what is now always understood by the Habeas Corpus Act was enacted. It consists of a variety of provisions, devised with so much skill, and so well adapted to give each other mutual support, that it may safely be asserted, that personal liberty will be safe in England and the United States, so long as this law remains in force. Evasion of it is almost impossible."

Here we see, as in a glass, the meaning of the words paraphrased by Lord Coke—that the law of the land means the law of the land, and nothing more.

Judge Johnson, in *the Bank of Columbia v. Okley*, 4 *Wheat.* 235, in delivering the opinion of the Court, says: "As to the words from Magna Charta, incorporated in the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this, that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." In this case, a provision in the charter of the bank, giving it summary process by execution, in the nature of an attachment, against its debtors, who had by an express consent in writing made the bonds, bills, or notes drawn or indorsed by them negotiable at the bank, was held not to be repugnant to the Constitution of the United States or of Maryland.

*Sears v. Cottrell*, 5 *Mich.* 254, was an action brought by Sears against Cottrell, who was a collector of taxes; for taking and selling a quantity of lumber belonging to plaintiff, lawfully in possession of J. & B. Bird, to pay a tax due from the latter. The act under which the tax was levied provided, that in case any person should refuse or neglect to pay a tax imposed on him, the collector of taxes should levy the same by distress and sale of the goods and chattels of such person, *or of any goods and chattels in his possession*, and that no claim of property to be made thereto by any other person should be available to prevent a sale; and gave the owner of such property a remedy against the person liable to pay the tax. We held the statute in that case constitutional; and that the phrases, due process of law in our Constitution, and law of the land in Magna Charta, mean the same thing.

*Chappee v. Thomas*, 5 *Mich.* 53, was decided by this Court in May term, 1858, preceding the decision of *Sears v. Cottrell* at the July term following. The question was the constitutionality of the statute authorising Circuit Courts, on entering judgment on an appeal from a justice's court against the appellant, at the same time to enter judgment against the surety for the appeal, on motion. The same objections were urged against the validity of the statute that were afterwards taken in *Sears v. Cottrell.* The court held the judgment correctly entered. Judge Christiancy, in delivering the opinion, says: "The bond is, we think, to be read in all respects as · if the whole of the statute in reference to the appeal, the bond, and mode of entering up judgment upon it, were recited at length in the bond."

If the bond was to be read in connection with the statute, as forming a part of the contract, in that case, is not the statute creating the lien, and providing for its enforcement, to be taken as a part of the contract for supplies? The only difference between the two cases is, that in that the agreement was in writing, while in this it is a. parol agreement. If that case, so far as it regards the reasoning of the Court, to which I have referred, was correctly decided, as I have · no doubt it was, the judgment of the Court in the present case, as it respects the constitutional question, should be for the plaintiff.

It may be objected that the reasoning to which I have referred in *Chappe v. Thomas*, stops short of the constitutional question. I do not think so. It assumes the validity of the statute. If the act was unconstitutional there was no statute, no law, to be interpolated by implication into the bond, and the reasoning of the court must necessarily fall to the ground. Courts frequently reason in this way, but it is always upon an assumption of the law.

If it be said that in that case, another reason given by the Court was, that the party had waived the constitutional provision, or had precluded himself from raising the

objection by giving the bond and claiming rights under the statute, the same is true of the bond on which the present action is founded.

If it be further said, with a view of showing the two cases are not parallel, that the defendant was under the necessity of giving the bond to regain possession of his vessel, the reply is, that in *Chappee v. Thomas*, the bond was necessary to perfect the appeal.

The decision of *Chappee v. Thomas* must stand on one or other of the two grounds I have stated; and either is sufficient for the present case.

But we are met with the objection, that our construction of the constitutional provision renders it a nullity, and that it must, therefore, mean something else.

Under the same article of the Constitution we find the following: Excessive bail shall not be required; excessive fines shall not be imposed; cruel or unusual punishment shall not be inflicted, nor shall witnesses be unreasonably detained, § 31. Suppose a statute to fix the amount of bail in a given case, can the court say it is excessive? Or the punishment; can the judge pronounce it cruel or unusual, and let the criminal go unpunished? Or the time a witness shall be detained to give evidence; can the court adjudge it unreasonable, and refuse to give effect to the statute? Where the statute leaves nothing to the discretion of the court, who is to judge of the excessiveness of the bail, or of the cruelty or unusualness of the punishment? Is it the law making power, the legislature? Or the law declaring power, the judiciary?

Every discharge from imprisonment, on habeas corpus, is in compliance with this constitutional injunction. Its insertion in Magna Charta was not the enunciation of a new law, but of what had always been claimed to be a part of the common law. Disregarded by the king and his government, it is true, but which he promised thereafter to observe. This promise, as we have already seen,

was not kept by him, or enforced by the courts, until the habeas corpus was secured to the subject in such a way that the courts could no longer evade their duty. Hence, in our Constitution, we find the provision under the judicial department instead of the legislative department, where we find the following, in relation to the habeas corpus: " The privilege of the writ of habeas corpus remains, and shall not be suspended by the Legislature, except in case of rebellion or insurrection the public safety require it," § 44. This last is a limitation on legislative power; while the first is a mandate to the judiciary to see that no man is deprived of his property or liberty against the law of the land.

This, it may be said, it would be the duty of the judiciary to do without any constitutional mandate. True. It was the duty of King John before Magna Charta, but did he observe it? It was the duty of the courts before as well as after, but they neglected it until spurred to the performance of their duty by the stringent provisions of the habeas corpus act of the 31st year of Charles II.

It may be that the rights of the government and citizen — those in power and those out — (for it was never necessary as between subjects), are so well understood at the present day as to stand in need of no such constitutional provision. But in this we discover no good reason for changing the original meaning of the words. Until those who contend for a different meaning can show us when the change took place, the occasion of it, and in what it consists, we prefer looking to the circumstances in which the phrase originated for its meaning, rather than to groping in the dark and treacherous regions of conjecture for something new, where each one is at liberty to give a loose rein to his fancy in conjuring up something to suit himself. Those who have tried the experiment, though satisfied with it, acknowledge their inability to give us either the name or the virtues of the new god they worship

In the case before us, this new object of worship would seem to be the power to put down some great wrong, that may possibly be done in giving effect to the act, in some extreme case that may be supposed to arise under it. Not that it has arisen, but that it may arise. Not that it is before us in all its frightful mien, but that its dim outlines may be descried in the murky distance approaching the judgment seat. It will be time enough to deal with the phantom when it presents itself in court, and if the judicial quiver should then be found not to contain an arrow that would pierce it, to frame one that would.

The proceedings are against the vessel to enforce the lien, which lien must exist to give them effect. The application for a warrant, to seize the vessel, must be in writing, specify the particulars of the demand, to whom it accrued, and the amount, and be verified by the affidavit of the claimant, or some credible person having a knowledge of the facts, § 3. This puts to flight the idea, that any one may trump up a claim against a vessel and have it sold. It cannot be done without the interposition of perjury; and, it is not enough to condemn a statute, that perjury may wrest it to iniquitous purposes. All judicial proceedings are subject to that infirmity.

Of a like character to the objection we have just been considering, is the further objection, that the vessel may be sold without the owner's knowledge, and without his having had an opportunity to controvert the existence of the lien, or its amount.

It can under no circumstances be sold under three and a half months after its seizure, and it may be four and a half months, or longer, before it is sold. During all of that time it is in custody of the sheriff. We can hardly suppose it possible for a vessel navigating our lakes to be that length of time in the custody of an officer, without its coming to the knowledge of the master, or owner.

But this is not all. Notice is required to be published for twelve successive weeks, once at least in each week, in a newspaper, setting forth all the facts, and that the vessel will be sold to satisfy the demand for which it has been seized, unless the owner, consignee or commander thereof, or some person interested therein, appear and discharge the warrant, according to law, within three months from the first publication of the notice. How discharge the warrant? By paying the demand, or giving the bond mentioned in the thirteenth section of the act.

A like notice is given under the statute to foreclose a mortgage at law, and it is difficult to give any good reason why a notice that is good for that purpose should be held objectionable in proceedings to enforce a lien against a vessel. The one is as likely to come to the knowledge of the owner of the thing to be sold as the other.

The notice is also to all persons claiming a lien under the act to deliver an account thereof to the officer issuing the warrant within three months, or that their remedy against the vessel will be forfeited. And, in *Watkins v. Atkinson*, it was held that creditors who failed to file their demands within the three months, lost their lien under the act. If the notice is good as to them, why not as to the owner of the vessel?

If the demand be valid the owner may have his vessel released on paying for it. If it be invalid, or for too large an amount, or if he wants time to pay it in, all he need do is to give a bond with surety for its payment, after judgment obtained on the bond for what is due in a court of competent jurisdiction. Or, if valid, and he is unable to pay it, to let the vessel be sold as soon as the proceedings under the statute will admit. The sooner the better, as every day it is in possession of the sheriff increases the expenses, which he will have to pay in the end, and lessens the surplus, if any, that will be coming to him. If this surplus is claimed by parties not entitled to

11 MICH.—J.

it filing claims under the notice, the statute makes ample provision for his contesting them before a jury. In all this I see no ground for complaint, but the reverse. Would he be benefited by a postponement of the sale to the close of a long and protracted litigation, with some one or more of the claimants? The sheriff's fees, in the meantime, accumulating, and the vessel deteriorating from day to day more rapidly at the dock than it would if in actual use? A case, occuring in a court of equity, in which the court would order the vessel to be sold, and the proceeds to be brought into court to abide the event of litigation.

I mention these things, not that they have anything to do with the constitutional question, but to show what seems to me the utter groundlessness of the complaints urged against the statute.

If we could suppose a case, which is highly improbable, of a vessel sold on proceedings instituted under the statute by one having no lien, and without the owner having had any notice of the proceeding, would he lose his property in the vessel? I think not.

To divest one of his property by statutory proceedings, the statute must in all its essentials be complied with. And this must be shown by the party claiming under them in an action brought to test their validity. A sale for taxes, though regular, so far as it regards the form of the proceedings, gives no title if the tax had been paid, or if no tax had been lawfully levied. The foreclosure of a mortgage at law, under the statute, is unavailing for any purpose, if the mortgage has been paid. The purchaser, to make out a title, must show the existence of the mortgage, as well as the regularity of the proceeding under the statute to foreclose it. We have a statute providing for the sale of personal property deposited with forwarding merchants, wharf keepers, warehouse keepers, &c., if the same is not claimed within three months. — *Comp. L. p.* 511.

No court, I presume, would pronounce such a law unconstitutional; or that the title to property sold under it would pass, if it had not been consigned to, or deposited with, such forwarding merchant, &c., although it might have been in his possession when it was sold. There are other statutes of a like character to be found in the statute book, which I think it will not be claimed are unconstitutional, that are open to all the objections that can be urged against the statute for the collection of demands against boats and vessels.

*Judgment affirmed.*